## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                          Case No. 19-cr-215(2) (DSD/ECW)

                Plaintiff,

      v.                                     **REPORT AND RECOMMENDATION**

STEVEN VUE (2),

                Defendant.

On August 13, 2019, Defendant Steven Vue ("Vue" or "Defendant") was indicted on one count of Conspiracy to Distribute Methamphetamine in violation of 18 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846; and one count of Possession with the Intent to Distribute Methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 18 U.S.C. § 2. (Dkt. 1.) This matter is before the Court on Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. 41); and Defendant's Motion to Suppress Statements, Admissions and Answers (Dkt. 42). This case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

The Court held a motion hearing on January 24, 2020. Allen A. Slaughter, Jr., Assistant U.S. Attorney, appeared on behalf of the United States of America and Douglas Olson, Office of the Federal Defender, appeared on behalf of Vue, who was present at the hearing on the instant motions. During the hearing on the motion to suppress, the Government presented a witness, St. Paul Police Officer Shawn A. Longen, and offered

five exhibits pertaining to the searches at issue. The parties have filed their respective post-hearing memoranda. For the reasons stated below, the Court recommends that Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. 41) be denied, and that Defendant's Motion to Suppress Statements, Admissions and Answers (Dkt. 42) be denied as moot based on the representations of the parties at the hearing.[1]

## I.    FACTUAL BACKGROUND

### A.    Search of a UPS Parcel

At the January 24, 2020 hearing, Officer Longen testified about his investigation of narcotics that resulted in the arrest of Vue and his co-defendant Paul Hue Thao ("Thao").

Officer Longen testified that he received information from K-9 Detective Mark Meyer with the Airport Police Department that Detective Meyer's certified narcotics detecting canine, "Whinny", alerted to the odor of narcotics coming from a package and that he sought and obtained a search warrant (Gov't Ex. 1) for the package from a Hennepin County District Judge. (Transcript (Dkt. 54) ("Tr.") at 8-9, 46.) In the Application for Search Warrant, Detective Meyer represented that he arrived at 7:00 a.m. on February 28, 2019 at the local UPS Facility to watch inbound parcels on a conveyor belt. (Gov't Ex. 1 at 00000309.) At 7:20 a.m., Detective Meyer observed a "Medium"

---

[1]    The Government noted at the hearing that there was an attempt to obtain a Mirandized statement from Vue and that there were interactions between law enforcement and Vue beforehand, but that the Government had no intention of using those in its case-in-chief.

brand moving box, which in his experience is commonly used in the shipment of narcotics. (*Id.*) The package originated from California, a source state for narcotics, and was sent person to person via air service, which drug dealers typically use because the narcotics will be in the system for a shorter period. (*Id.*) According to Detective Meyer, the characteristics of the package were consistent with previous packages that he had found to contain illicit narcotics. (*Id.*) Detective Meyer placed the parcel with five other packages and had Whinny search the area of the packages. (*Id.*) Whinny sniffed all the other packages before smelling the suspect package, and when she sniffed the suspect package she alerted for the odor of narcotics. (*Id.*) The Search Warrant for the parcel (issued at 9:52 a.m. on February 28, 2019) was executed, and 7.175 pounds of methamphetamine was discovered in the parcel as a result of the search. (Tr. 9-10; Gov't Ex. 1 at 00000313.)

Detective Meyer notified Officer Longen at approximately 10:20-10:30 a.m. on February 28, 2019 about the package and that its destination was for a location in Saint Paul. (Tr. at 10.) According to the Search Warrant for the parcel, the package was from a UPS Store in Oroville, California and its destination was for XXX Marion, Unit Number 1 in Saint Paul (hereinafter referred to as the "Residence"). (Tr. at 10; Gov't Ex. 1 at 00000309.) The parcel listed the sender's name as Toomy Vang and the recipient was listed as Laura B. (Tr. at 13; Gov't Ex. 1 at 00000309.)

Officer Longen testified that he then started an investigation into the destination address for the package and started to set up a plan for a controlled delivery of the package. (Tr. at 11-12.) At this point in time, Officer Longen did not have an ongoing

investigation involving Vue.  (*Id.* at 46.)  Through his investigation, Officer Longen

learned that the XXX Marion address was a duplex.  (*Id.* at 13-14.)  Officer Longen

spoke with the tenant who lived in the above unit, and through that tenant learned that the

tenant's name for Unit Number 1 was Sang Vang.  (*Id.* at 14.)

**B.    Anticipatory Search Warrant**

Officer Longen testified he submitted an Application for an Anticipatory Search

Warrant and Supporting Affidavit for the Residence, the same location where the parcel

of methamphetamine was destined to be delivered.  (Tr. at 12.)  According to Officer

Longen, the goal of the search warrant was to conduct a controlled delivery of the

package whereby an undercover person would deliver the package to the address listed

on the package and then execute the search warrant once the package was accepted.  (*Id.*

at 13.)  At the time of obtaining the Anticipatory Search Warrant, Officer Longen had no

information tying Vue or Thao to the Residence.  (*Id.* at 48.)

In the Application for the anticipatory search warrant, Officer Longen noted the

discovery of the 7.175 pounds of narcotics that field-tested positive for

methamphetamine, which was destined for the Residence.  (Gov't Ex. 2 at 00000340.)

Further, Officer Longen included that he learned from the tenant who lived in the above

unit of the duplex that the tenant of the Residence was Sang Vang.  (*Id.*)  Officer Longen

also represented that he learned that Sang Vang's driver's license listed the Residence as

his address.  (*Id.*)  The Search Warrant was signed by Ramsey County Judge Robert

Awsumb on February 28, 2019 at 1:56 p.m.  (Gov't Ex. 2 at 00000335.)

C.    **Controlled Delivery of the Parcel**

Officer Longen testified that in preparation for the controlled delivery of the parcel to the Residence, officers removed a majority of the actual methamphetamine from the package and then placed 114 grams back along with a mobile GPS tracking device and a light-sensing diode.  (Tr. at 14-15, 63.)  A light-sensing diode is a device that senses exposure to light.  (*Id.* at 15.)  Officer Longen testified that if you place a light-sensing diode inside of a box where there is limited exposure to light, when the box is opened and its interior is exposed to light it will communicate to a transmitter that will provide an alarm.  (*Id.*)  According to Officer Longen, the more light hitting the diode, the more rapid the tone of the alarm.  (*Id.*)  The initial plan was to have the package delivered and to wait for about 45 minutes to an hour, depending how many people were coming and going from the Residence, to see if officers received an alarm from the light-sensing diode, and thereafter execute the search warrant.  (*Id.* at 16.)

Detective Meyer served as the undercover UPS delivery driver.  (*Id.*)  At least four surveillance agents were present at the Residence to conduct visual observation of the location.  (*Id.* at 17.)  A marked Saint Paul Police squad car operated by Officers Aguirre and Zilge was available in order to make a stop in case the package left the Residence after its delivery.  (*Id.* at 18-19.)  Surveillance on the Residence occurred for three hours before the controlled delivery, and at no time did officers observe Vue or Thao entering the Residence.  (*Id.* at 63.)

Detective Meyer was equipped with a phone that served as a two-way audio transmitter during the controlled delivery of the package.  (*Id.* at 20-21.)  At

5

approximately 3:00 p.m., Detective Meyer approached the Residence and knocked on the front door. (*Id.* at 21.) A woman, who officers later learned was Laura Barkowski, answered the door and took the package from Detective Meyer. (*Id.*) The woman did not identify herself at the time the package was delivered. (*Id.* at 51-52.) Detective Meyer also described an Asian male standing behind the woman who accepted the package, who officers later identified as Vue after his arrest. (*Id.* at 22, 52.) The package was taken into the Residence and Detective Meyer returned to his UPS truck. (*Id.* at 22.)

**D.    Pursuit of Vue and Thao in a Ford Fusion**

Within two minutes after the package was delivered, officers observed Vue exit the rear side door of the Residence, open the rear driver's side door of a red Ford Fusion, and then enter the front driver's seat. (*Id.* at 22-23, 53.) Subsequently, Thao was observed leaving the Residence with the parcel, placing the parcel into the rear seat of the vehicle, and then entering into the back of the vehicle through the opened rear driver's side door. (*Id.* at 23-24, 53-54.)

Officer Longen followed the Fusion in an unmarked squad car as the vehicle made a number of turns. (*Id.* at 24-25.) Officer Longen observed the rear occupant of the Fusion messing with the top of the box. (*Id.* at 25.) Officer Longen then observed the Fusion speed up, which Officer Longen believed meant that the occupants of the vehicle realized that they were being followed. (*Id.* at 25.)

Officer Longen then received word that the tracker in the package was not working and then received an audio tone from the light-sensing diode signaling that the package was being opened. (*Id.* at 26; Gov't Ex. 5 at 21:21:13 to 21:21:18; 21:22:30 to

21:22:32.)  The report over the radio recorded from Officer Zilge's bodycam indicates that the officers had a pretty good tone on the package, and while they were not sure if it had been opened, they believed it had been opened.  (Gov't Ex. 5 at 21:21:13 to 21:21:18; 21:22:32 to 21:22:38.)  This occurred within two minutes of the vehicle leaving the Residence.  (Tr. at 27.)  Officer Longen testified that at this point in the surveillance he became concerned that the officers were going to lose the ability to track the vehicle and that Vue and Thao were trying to retrieve the methamphetamine from the parcel. (*Id.*)  Officer Longen called for the marked squad car to make a stop of the vehicle.  (*Id.* at 28-29.)  When asked why he called for the stop of the Fusion, Officer Longen testified that he had heard an audio tone from the light-sensing diode telling him that the narcotics package was open, he saw Thao in the back seat opening the package, and that the evasive driving of the Fusion indicated that its occupants realized something was going on.  (*Id.* at 34-35.)  On cross-examination, Officer Longen noted that he could not see the exact top of the package, but that he could tell that Thao was reaching into where the top of the package would have been.  (*Id.* at 55.)  Officer Longen stated that he needed to get the vehicle stopped, the individuals arrested, and the evidence recovered, to ensure that the narcotics in the parcel did not end up sold in the city (especially since the tracker was no longer functioning).  (*Id.* at 34-35.)

Officers Aguirre and Zilge initiated their siren and lights to try to stop the Fusion. (*Id.* at 29.)  Officer Zilge radioed that the vehicle was not stopping and began to take off at a speed greater than the posted speed limit.  (*Id.*)  The vehicle also ran through two stop signs.  (*Id.*)  Indeed, the footage from the patrol vehicle showed a vehicle going at

what appeared to be a high rate of speed down snowy residential roads, past school buses, and through multiple stop signs without stopping. (Gov't Ex. 4. at 15:22:45 to 15:23:35.) The officers continued pursuit until the vehicle stopped on a dead-end street at Germain and Dale, at which point the two occupants of the vehicle left the vehicle and fled on foot. (Tr. at 33-34; Gov't Ex. 4 at 15:24:21 to 15:24:34; Gov't Ex. 5 at 21:24:07 to 21:24:56.) Officer Longen estimated that it took approximately five minutes from the time the vehicle left the Residence to when the vehicle was ditched. (Tr. at 69.) Officers took Vue and Thao into custody at gun point in a park. (Tr. at 38-39; Gov't Ex. 5 at 21:26:10 to 21:27:33.)

**E.     Search of the Ford Fusion**

The Ford Fusion was searched when Officer Longen reached the scene. (Tr. at 39.) The vehicle was unlocked. (*Id.* at 58.) When asked why he did not obtain a search warrant for the vehicle, Officer Longen testified that the vehicle and persons inside had just fled police and he knew that a package containing methamphetamine had been placed into the vehicle. (*Id.* at 39.) As part of the search, Officer Longen found the parcel that had been delivered to the Residence by Detective Meyer. (*Id.*) The top of the box was open and there was a little folding knife in the back of the seat. (*Id.*) While some of the other contents of the package had been taken out, the methamphetamine was still inside the box. (*Id.* at 40, 56-57.) In addition, officers found approximately an ounce of suspected methamphetamine in the driver's side door cupholder of the vehicle, unrelated to the methamphetamine found in the parcel. (*Id.* at 40, 59.) Officers also found paperwork for Steven Vue and Laura Barkowski, related to a police report for both

8

of them from Glendale, Arizona. (*Id.* at 40.) Vue was searched incident to arrest and taken into custody. (*Id.*) Officers learned that the Ford Fusion was a rental vehicle listed to PV Holding Corp. (*Id.*) Officers did not know who had rented the vehicle. (*Id.* at 59.) Officers later found the GPS tracker and the light-sensing diode on the street in the travel path the Ford Fusion had taken during its flight from police. (*Id.* at 45.)

### F.    Traffic Stop of Sang Vang

While pursuit of the Defendants was occurring, surveillance officers were directed to maintain visual surveillance of the Residence. (Tr. at 41; Gov't Ex. 5 at 21:20:00 to 21:20:08.) During this surveillance, a male was seen leaving that address who was later identified as Sang Vang. (Tr. at 41.) He was observed getting into a vehicle parked out front of the Residence, which officers knew was registered to Vang. (*Id.*) Vang was followed and a traffic stop of his vehicle occurred in the area of Arcade and Jenks. (*Id.*) According to Officer Longen, Vang was stopped because officers were going to execute a search warrant for the Residence to look for furtherance of a conspiracy to distribute methamphetamine, and Vang had left the address, so officers wanted to make sure that he was not leaving with more evidence from that address. (*Id.* at 41-42.) Vang was stopped in front of a Checkerboard Pizza and officers recovered $2,400 from his person and then an additional $2,300 from his clothing when he was booked and arrested. (*Id.* at 42.) Vang claimed that this money was his tip money from working at Checkerboard Pizza. (*Id.*)

**G.    Second Search Warrant for the Residence**

Officer Longen testified that he sought a second search warrant for the Residence. (Tr. at 42-43.)  He noted that the first search warrant for the Residence was an anticipatory warrant based on delivery of the package into the address, so he wrote another search warrant to include the information that had been developed since the parcel was delivered in an abundance of caution.  (*Id.* at 43, 70-71.)  The Application in support of the second search warrant included the information provided in the anticipatory search warrant application along with the following relevant additional information:

> An anticipatory warrant was signed and issued by the Honorable Ramsey County Judge Robert Awsumb for the address of XXX Marion Street, Unit 1.
>
> The methamphetamine was recovered from the parcel 1Z V89 79Y 01 7758 5651.  Approximately 114.5 grams (with bag) was placed back into parcel 1Z V89 79Y 01 7758 5651, along with a light sensing monitor and a mobile tracking device.
>
> Your affiant directed undercover agent attempt to deliver the package to XXX Marion Street Unit #1, St. Paul MN 55117.  Detective Meyers delivered parcel 1Z V89 79Y 0177585651 to the address of XXX Marion Street to the door marked Unit #1.  The door was answered by a white female with blond hair.  Surveillance officers from Airport Police Department, D.E.A and Ramsey County VCET were conducting surveillance on the address when the parcel was delivered. After parcel 12 V89 79Y 0177585651 was accepted into Unit #1, surveillance reported that two Asian males exited the rear door of the apartment and observed one of the males open the driver's side rear door of vehicle bearing Minnesota license plate BXB-XXX and then enter the driver's side front seat.  Surveillance observed the second Asian male exit Unit 1, carrying what they could see was parcel 12 V89 79Y 01 7758 5651.  Surveillance said the second Asian male placed parcel 12 V89 79Y 01 7758 5651 in the rear driver's seat of vehicle bearing Minnesota license plate BXB-XXX, and then entered the rear seat via the driver's side rear door.  The vehicle then left and was followed by surveillance vehicles.

10

As the vehicle drove away, the light sensor indicated that parcel 1Z V89 79Y 01 7758 5651 was being opened. A marked St. Paul Police squad attempted to stop the vehicle and the driver of the vehicle fled from the marked patrol squad. The vehicle was located as the two Asian males fled on foot from it. Both were taken into custody, and Identified as, PAUL HUE[2] DOB: XX/XX/XXXX and STEVEN VUE DOB: XX/XX/XXXX. Parcel 1ZV89 79Y 0177585651 was located in the rear seat of the vehicle. A large amount of suspected methamphetamine was also found inside the driver side door cup holder area of the Ford Fusion license BXB-XXX. The suspected methamphetamine which was located in the driver's side door of BXB-XXX was not the methamphetamine from parcel 1Z V89 79Y 01 7758 5651. The 114.45 grams methamphetamine which was placed into parcel 1Z V89 79Y 01 7758 5651 was relocated inside of parcel 1Z V89 79Y 01 7758 5651 where It had been placed and was recovered.

The light sensor and tracking device had been removed from parcel 1Z V89 79Y 01 7758 5651, and were later located in the area of Front Street and Western Ave, along the route the vehicle BXB-XXX had driven after It left the address of XXX Marion Street, Unit #1.

Shortly after parcel 1Z V89 79Y 01 7758 5651 left with HUE and VUE, surveillance reported another Asian male left XXX Marion Street, Unit #1 and entered a Mitsubishi Eclipse bearing MN license plate AHW-XXX which registered to SANG VANG. The male was followed away from the address and was stopped. The driver of the vehicle was identified as SANG VANG. VANG had approximately $4000.00 in U.S. currency on his person and in his vehicle.

A criminal history check of STEVEN VUE showed him to have previous arrests in California and Arizona for crimes related to, auto theft, possession of a controlled substance while armed, possession of a controlled substance.

A criminal history of PAUL HUE showed him to have arrests in California for obstruction of arrest, shooting at an inhabited dwelling, assault with a firearm on a person, battery with serious bodily injury, and crimes to benefit a gang.

Surveillance has remained in place and the white female who accepted parcel 1z V89 79Y01 7758 5651 has not left the address of XXX Marion Street,

---

[2]     The full name of Vue's co-defendant is Paul Hue Thao.

Unit #1.  No other person other than those listed in this warrant has been observed leaving or entering the address since surveillance was put in place.

Based on parcel 1Z V89 79Y 01 7758 5651 being accepted and brought inside of XXX Marion Street, Unit #1 in the city of St. Paul, the subsequent arrest of two individuals who left the address with parcel 1Z V89 79Y 01 7758 5651, and were found to be in possession of suspected methamphetamine not related to parcel 12 V89 79V 0177S85651, and an unknown female who accepted the package who we believe has remained Inside XXX Marion Street, Unit #1, your affiant requests to execute this search warrant to recover further evidence of methamphetamine along with other evidence involving the distribution of illegal narcotics.

(Gov't Ex. 3 at 00000327-328.)

Ramsey County District Judge JaPaul Harris signed the Search Warrant for the residence on February 28, 2019 at 6:12 p.m.  (*Id.* at 00000321.)  Officers executed the Search Warrant for the Residence on the same day.  (Tr. 43.)  Officers found and seized a large amount of marijuana, what officers believed were drug ledgers, a large amount of U.S. Currency, phones and cash cards, and residential documents for Sang.  (Tr. at 43; Gov't Ex. 3 at 00000315.)  Barkowski was arrested during the search and a small amount of the methamphetamine was found on her person.  (Tr. at 44.)  There was nothing found in the Residence or the Ford Fusion specifically linking Vue to the Residence.  (*Id.* at 60-61.)

## II.    DISCUSSION

Vue requests that the Court suppress all evidence found in the "illegal" warrantless search of the Ford Fusion.  (Dkt. 52 at 3-4.)  Vue further requests suppression of the evidence seized at the Residence pursuant to the second search warrant (Gov't Ex. 3) on

the basis that it was not supported by sufficient probable cause and because the *Leon*

good-faith exception does not apply.  (*Id.* at 4-9.)

## A.    Motion to Suppress Evidence Obtained as a Result of Search and Seizure of the Ford Fusion

Vue's basis for suppression of the items found in the Ford Fusion on February 28,

2019 is that under the circumstances of the search, no exceptions existed to the warrant

requirement since there were no exigencies present or other reason that would justify not

obtaining a search warrant before searching the vehicle.  (*Id.* at 3.)  Vue argues that no

exigencies existed because the occupants of the Ford Fusion had fled the vehicle and had

been arrested before the search was conducted.  (*Id.*)  The Government counters that the

automobile exception to the warrant requirement applies.  (Dkt. 57 at 16-18.)

Searches without a warrant are per se unreasonable, subject to a few well-

established exceptions, which includes an automobile exception.  *See United States v.*

*Hill*, 386 F.3d 855, 858 (8th Cir. 2004).  "The automobile exception to the Fourth

Amendment allows police officers to conduct a warrantless search of a vehicle if, at the

time of the search, they have probable cause to believe that the vehicle contains

contraband or other evidence of a crime."  *United States v. Brown*, 550 F.3d 724, 727

(8th Cir. 2008) (internal quotation marks omitted); *see also United States v. Edwards*,

891 F.3d 708, 712 (8th Cir. 2018), *cert. denied*, 139 S. Ct. 349 (2018) ("Under the

automobile exception to the warrant requirement, officers may conduct a warrantless

search of a vehicle if they have probable cause to believe that the car contains contraband

or other evidence.").  "Probable cause sufficient to justify a search exists where, in the

totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Vore*, 743 F.3d 1175, 1179 (8th Cir. 2014) (quoting *United States v. Kennedy*, 427 F.3d 1136, 1141 (8th Cir. 2005)). The Supreme Court has explained that the reason for this exception lies in the lower expectation of privacy in vehicles and their unique mobility. *See California v. Carney*, 471 U.S. 386, 390-91 (1985).

Here, officers had sufficient probable cause to conduct a warrantless search of the abandoned Ford Fusion. As discussed above, officers made a controlled delivery of a package containing methamphetamine to the Residence and observed Vue in the doorway of the suspect Residence when the package was accepted and brought into the Residence. Within two minutes of that delivery, officers observed Vue and Thao taking the package from the Residence and transporting it in the Ford Fusion. Officer Longen then observed what appeared to be Thao trying to open the package in the Ford Fusion and then receiving an alarm from the light-sensing diode alerting that the package was being opened. This information, coupled with Vue attempting to flee officers all within a period of approximately less than seven minutes from the delivery (two minutes from delivery to the Residence to Defendants leaving with the package in the Fusion and a five minute pursuit by police), provided sufficient probable cause to search the vehicle for the narcotics given that there was a fair probability that the delivered package with methamphetamine would be found in the Ford Fusion. *See United States v. Payne*, 119 F.3d 637, 643 (8th Cir. 1997), *cert. denied* 522 U.S. 987 (1997) (probable cause for warrantless search of automobile where police observed individual place suitcase which

was believed to contain drugs into trunk of car); *see also Edwards,* 891 F.3d at 711 (holding that the probable cause standard is "not a high bar," and it "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity") (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018)).  While Vue argues that at most officers had probable cause to search for the package with the methamphetamine, "[i]f there is probable cause to believe a vehicle contains evidence of criminal activity, *United States v. Ross*, 456 U.S. 798, 820-21 (1982), authorizes a search of any area of the vehicle in which the evidence might be found."  *Arizona v. Gant*, 556 U.S. 332, 347 (2009).  Given that there was probable cause to believe that the vehicle contained narcotics, the search of the entire vehicle did not violate the Fourth Amendment.  *See United States v. Fladten*, 230 F.3d 1083, 1086 (8th Cir. 2000) ("In the present case, the automobile was parked in the driveway of a house where agents had found evidence of drug-related activity.  An item commonly used in the manufacture of methamphetamine was in plain view in the back seat of the automobile.  This was viewed by Detective Stewart through the automobile window.  These facts provided a substantial basis for the conclusion that further contraband or evidence may have been in the other parts of the automobile.  Since the agents had probable cause, the automobile exception allowed them to search the trunk of the automobile and seize the contraband found there.").

In sum, the Court concludes that the totality of the information available to the officers at the time of the search of the vehicle established a fair probability that a search of the entire Ford Fusion would reveal contraband or other evidence.  Therefore, the

motion to suppress the search and seizure of evidence from Ford Fusion on February 28, 2019 should be denied under the automobile exception.

**B.      Motion to Suppress the Evidence Seized at the Residence**

The Court now examines Vue's contention that second search warrant for the Residence lacked probable cause for its issuance and that the *Leon* good-faith exception does not apply.  The Government counters that Vue lacks standing to challenge the search warrant for the Residence, the search is supported by the requisite probable cause, and in any event, the search and seizure was valid under the *Leon* exception.  (Dkt. 57 at 10-16.)

**1.      Whether Vue Has Standing to Challenge the Search Warrant**

The Government argues that Vue failed to articulate any facts demonstrating standing to challenge the search warrant issued for the Residence on February 28, 2019. (Dkt. 57 at 10.)

"[S]uppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence."  *Alderman v. United States*, 394 U.S. 165, 171-72 (1969); *see also United States v. Maxwell*, 778 F.3d 719, 732 (8th Cir. 2015) (citations omitted).  "The defendant moving to suppress has the burden of proving a reasonable expectation of privacy in the area searched."  *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994).  Vue may not rely upon "'positions the government has taken in the case' but must 'present evidence of his standing, or at least point to specific evidence in the record which the government presented that establishes

16

his standing.'"  *Maxwell*, 778 F.3d at 732 (quoting *United States v. Zermeno*, 66 F.3d

1058, 1062 (9th Cir. 1995)) (cleaned up).

    In this case, there is no evidence of any connection between Vue and the

Residence so as to find that he had a reasonable expectation of privacy in the premises,

except for the fact that he was seen leaving the Residence.  Based on the available facts,

Vang Sang was the tenant.  (Tr. at 14.)  Indeed, Vue established at the hearing there was

no connection between himself and the Residence.  (*Id.* at 60-61.)  At most, based on the

evidence in the record, the Court could deduce that Vue was a visitor at the Residence,

although that is not conclusive.  Even if that is the case, a mere "'casual visitor does not

have an expectation of privacy . . . .'"  *United States v. Valdez*, No. 18-CR-282

(ADM/LIB), 2019 WL 2016801, at *12 (D. Minn. Feb. 7, 2019), *R.&R. adopted*, 2019

WL 1466902 (D. Minn. Apr. 3, 2019) (quoting *United States v. Heying*, No. 14-cr-30

(JRT/SER), 2014 WL 5461988, at *17 (D. Minn. Aug. 15, 2014), citing *United States v.

Perez*, 700 F.2d 1232, 1236 (8th Cir. 1983)); *see also United States v. Davis*, 361 F.

App'x 704, 705-06 (8th Cir. 2010) (finding that the defendant lacked standing to

challenge the search warrant authorizing the search of his uncle's home when "[t]he

evidence did not show that [he] either lived or stayed more than irregularly at his uncle's

residence, that he stored personal effects there which he admitted to owning, or that he

had exclusive access to or had taken precautions to maintain privacy in . . . the room

where the ammunition was found").

    Given that Vue has not set forth evidence relating to his connection to the

Residence beyond a casual visitor, he has failed to establish that he has a reasonable

exaptation of privacy in the Residence, and he therefore lacks standing to challenge the search warrant.

### 2.     Whether the Second Search Warrant for the Residence is Supported by Sufficient Probable Cause

Even assuming that Vue has standing to challenge the Search Warrant (Government Exhibit 3), the Court finds that its issuance was supported by sufficient probable cause.

Ordinarily, searches pursuant to a warrant are reviewed to determine if there was probable cause for the search in the search warrant application and affidavit. *See Gates*, 462 U.S. at 236. "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *Fladten*, 230 F.3d at 1085 (citing *Gates*, 462 U.S. at 238). The task of a court issuing a search warrant is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *United States v. Colbert*, 605 F.3d 573, 576 (8th Cir. 2010) (quoting *Gates*, 462 U.S. at 231)). In reviewing the decision of the issuing court, the duty of the reviewing court is simply to ensure that the court had a substantial basis for concluding that probable cause existed. *See Gates*, 462

U.S. at 238-39 (citation omitted); *see also United States v. LaMorie*, 100 F.3d 547, 552 (8th Cir. 1996) (citation omitted) ("Our duty as a reviewing court is to ensure that the issuing judge had a 'substantial basis' for concluding that probable cause existed, and we owe substantial deference to the determination of probable cause by the issuing judge."). As to what this Court should consider when reviewing a search warrant for probable cause, "[w]hen the [issuing judge] relied solely on the affidavit presented to him, 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (citing *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir. 1999), quoting *United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995)); *United States v. Smith*, 581 F.3d 692, 694 (8th Cir. 2009) (quoting *United States v. Reivich*, 793 F.2d 957, 959 (8th Cir. 1986)).

Vue's main argument challenging probable cause is that once the package left the Residence, there was nothing connecting the Residence to any criminal activity, causing probable cause to dissipate once the package left the Residence. (Dkt. 52 at 5-6.) However, the fact that the package with methamphetamine left the Residence does not mean that probable cause to search Residence extinguished. It is important to note that while the second Search Warrant was not an anticipatory search, the weight of the delivery for purposes of probable cause was triggered once the delivery of the package addressed for the Residence containing what was intended to be over seven pounds of methamphetamine was accepted into the Residence. For the purposes of finding a sufficient nexus between narcotics and the Residence, the delivery of a package remains

19

valid even though it was removed from Residence after delivery, because the acceptance of the package at the Residence and not its ultimate destination establishes the relationship between narcotics trafficking and the Residence. The acceptance of the package at the Residence coupled with the fact that two of the persons present left the Residence with the package, which was recovered, along with methamphetamine separate from that found in the package delivered to the Residence; the fact that Sang Vang, the tenant of the Residence, left the Residence during this time period and was found with $4,000 in cash; and that fact that the occupant of the Residence who accepted the package of drugs remained in the Residence, provided sufficient probable cause that evidence of methamphetamine, along with other evidence of the distribution of illegal narcotics, would be found at the Residence.

### 3.    *Leon* Exception

Because the search warrant was supported by probable cause (as set forth above), this Court need not determine whether the good-faith exception set forth in *United States v. Leon*, 468 U.S. 897 (1984), should apply. The Court notes, however, that even if the warrant was deficient, the officers' reliance on the warrant would have been reasonable under *Leon*.

Under *Leon*, "'evidence seized pursuant to a search warrant issued by a [judge] that is later determined to be invalid[] will not be suppressed if the executing officer's reliance upon the warrant was objectively reasonable.'" *United States v. Houston*, 665 F.3d 991, 994 (8th Cir. 2012) (quoting *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007)). In *Leon*, the court stated that "'searches pursuant to a warrant will rarely

require any deep inquiry into reasonableness,' for 'a warrant issued by a magistrate normally suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search.'"  468 U.S. at 922 (citations omitted).  However, the *Leon* court noted that there are certain instances when "the purpose of the exclusionary rule—deterring police misconduct—will not be served by suppressing illegally seized evidence."  *United States v. Martin*, 833 F.2d 752, 755 (8th Cir. 1987); *Leon*, 468 U.S. at 922-23.  "When a police officer acts in an objectively reasonable manner in reliance on a subsequently invalidated search warrant, there is no rational reason for suppressing the fruits of the search."  *Martin*, 833 F.2d at 755.  The Court's "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization."  *Leon*, 468 U.S. at 923 n.23.  The reviewing court should consider the totality of the circumstances, "including any information known to the officer but not included in the affidavit . . . ."  *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015) (citation omitted).  In this regard, evidence obtained as a result of an unconstitutional search should be suppressed under the following circumstances:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge;
>
> (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant;
>
> (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and

(4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*Houston*, 665 F.3d at 995 (quoting *Proell*, 485 F.3d at 431).

As to the first exception, Vue presented no evidence that the issuing judge was misled by a false statement in the Application that Officer Longen made knowingly and intentionally or with reckless disregard for its truth. In addition, Vue has not alleged— and the Court does not find—that the issuing judge wholly abandoned their judicial role in issuing the search warrant. Nor has Vue propounded an argument under the fourth exception.

As to the third exception, Vue argues that the *Leon* good-faith exception does not apply because the search warrant was so lacking in indicia of probable cause that a belief in its existence was objectively unreasonable. (Dkt. 52 at 8-9.) Vue has not explained why the search warrant was so lacking in indicia of probable cause, as its Application, as described above, contains numerous specific facts supporting the conclusion that there was a fair probability that contraband or evidence of criminal activity would be found at the Residence. Accordingly, the Court finds that the search warrant for the Residence was not so lacking in indicia of probable cause that a belief in its existence was objectively unreasonable.

Therefore, the Court recommends denial of this motion on the additional alternative ground that the *Leon* exception applies.

4.      **Conclusion**

For all of the reasons set forth above, the Court finds the motion to suppress the search warrant for the Residence should be denied.

### III.      RECOMMENDATION

Based on the files, records, and proceedings herein, **IT IS RECOMMENDED THAT:**

1.      Defendant Steven Vue's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. 41) be **DENIED**.

2.      Defendant Steven Vue's Motion to Suppress Statements, Admissions and Answers (Dkt. 42) be **DENIED** as moot.


DATE:      April 27, 2020                *s/ Elizabeth Cowan Wright*
                                         ELIZABETH COWAN WRIGHT
                                         United States Magistrate Judge


### NOTICE

Filing Objections: This Report and Recommendation is not an order or judgment of the District Court and is therefore, not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in LR 72.2(c).